UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EILEEN M. FELIX,

        Plaintiff,

v.                                        Case No. 13-CV-1188

WISCONSIN DEPARTMENT OF
TRANSPORTATION,

        Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Eileen M. Felix was fired from her job as a customer service agent and driving test proctor at the Appleton office of the Division of Motor Vehicles (DMV) after she superficially cut her wrists at work and collapsed on the floor of the lobby, crying and screaming until an ambulance transported her to a local hospital. Felix claims she was fired because of her mental disabilities in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) and the self care provision of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2612(a)(1). Defendant Wisconsin Department of Transportation (DOT), has moved for summary judgment on several grounds, including that Plaintiff's Rehabilitation Act claim fails because her behavior in the workplace was unacceptable regardless of whether it was precipitated by a disability, and her FMLA claim fails because Congress did not validly abrogate the states' sovereign immunity in the self care provision of the FMLA. For the reasons below, the defendant's motion for summary judgment will be granted.

1

# I. BACKGROUND

Eileen Felix was employed at the DOT's Appleton, Wisconsin Division of Motor Vehicles office since 1998. Her most recent job title was DMV Field Agent Advanced, which is currently called Customer Service Representative Advanced. This job entails staff work behind the counter at the DMV processing applications for vehicles and driver's licences, as well as administering road tests for new drivers applying for licenses. According to Felix's supervisor at the DMV, Clifford Ehlert, Felix's position requires conducting approximately twenty road tests per week, which equates to being out of the office for between one and one-and-a-half business days per week. (Ehlert Dec. ¶ 8, ECF No. 18.) Ehlert also stated that Felix "excelled at the advanced duties of conducting road tests." (*Id.* ¶ 9.)[1]

As part of her regular duties, Felix collected fees for driver's licenses, vehicle title registration, and other products. Felix generally met all of the DOT's performance goals for her position except that related to financial accountability, meaning that her cash register reflected money handling errors that were not acceptable according to the DOT's financial performance standards. (*See* Def.'s Proposed Findings of Fact (DPFOF) ¶ 12, ECF No. 24.) Felix also began having an interpersonal conflict with a co-worker, nicknamed "Ace," at the DMV around 2010 or 2011. (*Id.* ¶ 13.) Felix filed an incident report relating to an incident in which Felix claimed the Ace rammed her shoulder into Felix on November 17, 2011. The DOT investigated Felix's claim but could not substantiate it.

---

[1]The court's effort to determine the undisputed facts has been made more difficult by the Plaintiff's habit of improperly interposing objections, such as "vague and ambiguous," "speculative," and "without evidentiary support," to all or almost all of the DOT's 150 proposed findings of fact. Where the objections are unfounded, as most are, and Plaintiff's response to the substance of the proposed finding fails to cite evidentiary support for the denial, they are ignored.

In 2012, Felix expressed an interest in a transfer to the DOT's Eau Claire, Wisconsin DMV. The DOT maintains Felix's request was due to ongoing issues with Appleton personnel, while Felix maintains her request to transfer was for medical reasons. (DPFOF ¶ 39; Pl.'s Responses to Def.'s Proposed Findings of Fact (Pl.'s Resp. to DPFOF) ¶ 39, ECF No. 30.) Felix's request was ultimately denied on the basis that there were no open positions in the Eau Claire office and that pursuant to the applicable collective bargaining agreement, an employee must pass a performance evaluation prior to receiving a transfer. (*See* DPFOF ¶ 40.) Felix's difficulties with financial accuracy had resulted in her being placed on a six-month probationary period and DOT personnel management advised Felix in response to her request for a transfer that she would have to improve her financial accuracy before being considered for a transfer. (*Id.*) The result of Felix's six-month probationary period from April through September 2012 was an overall unsatisfactory evaluation due to more financial accuracy issues. At the end of Felix's first probationary period she was placed on a second probationary period of three months and, if her performance did not improve, she would be placed on a third probationary period and given one last chance to make improvements. (*Id.* ¶¶ 32, 33, 56.)

Felix also experienced anxiety at work that resulted in several panic attacks and other difficulties. On June 19, 2012, she had a panic attack after a supervisor had informed Felix her drawer was short ten dollars and she was missing a check. (DPFOF ¶ 43.) On this occasion, Felix told her supervisor she was having trouble breathing, could not hold back tears, and that she was sick and needed to leave work. (Pl.'s Resp. to DPFOF ¶ 42.) Aside from this incident, Felix would generally take medication to manage her anxiety at work and she would also tell her supervisor she

3

needed to go to the bathroom for 15 minutes, do some breathing exercises, and then come back to work and perform her job. (DPFOF ¶ 44.)

On November 5, 2012, Felix emailed Ehlert and asked who she should contact about a "medical transfer." Ehlert directed Felix to Maya Rudd, the DOT's Affirmative Action/Equal Employment Opportunity and Diversity Program Officer, and Rebecca English, the DOT's Medical Coordinator. In her deposition Felix described what she meant by her request for a medical transfer as follows: "When I write that, my medical transfer would be I would like my doctor to be able to—if he would be willing or she be willing to say that for health reasons that I needed to be transferred to a different office. Now, whether I could get that or not at the time, I wasn't sure." (DPFOF ¶ 65.) Rudd replied to Felix by email on November 5 and explained the DOT's reasonable job accommodations requirements and that a transfer due to medical reasons would only be considered if an alternate position is open and the candidate meets the qualifications. (*Id.* ¶ 67.)

Felix's performance evaluation for October through December 2012 showed her performance had improved. But after receiving her performance evaluation for January through March 2013, which apparently was less positive, Felix telephoned DOT Human Resources Director Randy Sarver on April 17, 2013 to express concern that she would be dismissed due to poor performance. (*Id.* ¶ 80.) Felix telephoned Sarver again the following morning, April 18, 2013, about her performance evaluation.

Later on the morning of April 18, Felix was working at her station when Ace came into Felix's work area. Ace was rummaging around some shelving where reference materials were kept. Ace bent over, and when she stood up, her long hair was full of static electricity and stuck to Felix. When Ace walked away, Felix felt a panic attack coming on. (*Id.* ¶ 84.) At approximately 10:50

4

a.m., Felix went to Ehlert's office and told him she was having a panic attack and was going to the bathroom to calm down. Ehlert told Felix to take all the time she needed. (*Id.* ¶ 85.) A half hour later, Ehlert heard muffled screaming coming from the lobby. As he was getting up to see what was going on, a DMV employee came to his office and said Felix had fallen down. (*Id.* ¶ 86.)

Ehlert saw Felix lying on the floor behind work counter number 6. Felix was lying on her right side, clutching her cell phone and crying loudly while trying to speak. There were marks and scratches on her right wrist and a couple of cuts that were bleeding slightly. (*Id.* ¶ 87.) An employee called 9-1-1. Most of Felix's speech was unintelligible, but according to Ehlert, Felix did say things like: "I want my insurance . . . they will take your insurance . . . don't let them take your insurance . . . I need to get my money – don't take my money . . . they don't trust you . . . they steal your money . . . you all hate me . . . they all hate you . . . everybody hates you . . . they think you're crazy . . . you all think I'm crazy . . . they want to get rid of you." (*Id.* ¶ 89.) When Felix rolled over on her back, Ehlert observed cuts and scratches on her left wrist as well. While on her back, according to Ehlert, Felix kicked her legs and appeared to be like a child throwing a temper tantrum. (*Id.* ¶ 90.) Felix also made statements such as "They're too dull . . . the knives were too dull . . . God let me die . . . I just want to die." (*Id.* ¶ 91.) After 5–7 minutes, a fire truck arrived, but the fire department was unable to calm Felix down. After an ambulance arrived, a DMV employee and the paramedics were able to calm Felix down and she was moved into the break room.

Although her responses to the DOT's proposed findings of fact indicate she lacked knowledge and information sufficient to form a belief as to the truth of these facts, Felix admitted the April 18 incident was the most severe panic attack she had had in her life. (Pl.'s Resp. to DPFOF ¶ 93.) DMV staff was also upset. According to Ehlert, the staff reported feeling unsafe and

asked that the lock code on the back door be changed. (DPFOF ¶ 94.) Ehlert arranged for a counselor to come to the DMV to meet with each staff member after the incident. (*Id.* ¶ 95.)

The next day, Sarver sent an email stating that Felix needed to undergo an independent medical examination so the department could determine if Felix would be able return to work, considering her own personal safety and the safety of others. (*Id.* ¶ 98.) Without medical documentation stating that Felix's condition was controlled and that she would not have a panic attack during road testing, Ehlert was concerned with having Felix alone in a vehicle with 16-year-olds who are testing for their driver's license. (*Id.* ¶ 97.) Sarver advised Felix she would not be able to return to work until she underwent the examination. (*Id.* ¶ 100.) The same day, on April 19, 2013, Ehlert signed Felix's three-month evaluation unsatisfactory (the one Felix had reviewed prior to her panic attack) because it was due to the human resources office and it was unknown when Felix would return to work. (*Id.* ¶ 102.)

Around April 22, 2013, with Felix still not back to work, Ehlert filled out an FMLA leave request form on behalf of Felix and initiated a conversation with Felix about submitting the FMLA request. (Ehlert Dec. ¶ 51.) He submitted the form on April 24. On April 29, Felix's daughter dropped off a note from Felix's doctor indicating Felix would not return to work until May 22, 2013 when she will see her physician. (*Id.* ¶ 55.) While Felix was not at work following the incident, the DOT considered her to be on FMLA leave. Between April 22, 2013 and July 12, 2013, she exhausted her entire allotment of Wisconsin and federal FMLA leave. (*Id.* ¶ 105.)

On May 8, 2013, English emailed Felix that her fitness for duty evaluation was scheduled for May 28, 2013. Attached to the email was a letter to Felix in which English strongly recommended that Felix provide medical documentation from her treating providers directly to the

6

doctor before the evaluation. (*Id.* ¶ 108.) The evaluation was conducted by Dr. Daniel Burbach on May 28. Burbach's task was to assist the DOT in determining whether Felix was able to safely, effectively and efficiently perform the full scope of her job duties as a DMV Customer Service Representative-Advanced, with or without an accommodation. (*Id.* ¶110.) Felix did not provide any medical records before the evaluation, but instead provided a list of her treatment providers to Dr. Burbach and signed releases allowing her providers to send information to Burbach. (*Id.* ¶ 111.) Felix said in her deposition that she did not bring records to the evaluation because the DOT did not require her to do so, and that she thought providing her doctors' information to Burbach so they could fax him would be "so much faster." (Pl.'s Proposed Findings of Fact (PPFOF) ¶ 47, ECF No. 29.) The DOT did receive a form from Felix's doctor, Dr. John Thomas Beld, on May 28, but the form was incomplete. (DPFOF ¶ 112.)

On June 2, 2013, English received a copy of Dr. Burbach's report on Felix's fitness for duty evaluation. Burbach's report concluded, among other things, that "[t]he results of [his] evaluation indicate that Ms. Felix remains at increased risk for potentially violent behavior toward self <u>and</u> others within the workplace." (*Id.* § 113(a).) Dr. Burbach also wrote: "On the basis of this evaluation, I would predict future episodes of crying, complaining, excuse making, blaming others, isolation/estrangement, resistance to supervisory efforts, retaliatory verbal threats, purposeful provocation/antagonism of others, angry and irrational outbursts (e.g. shouting, screaming, slamming door/drawers, breaking items), physical alterations with coworkers (e.g. shoving, elbowing, shouldering, slapping), self-inflicted injuries, suicidal threats and gestures (e.g. vague suicidal comments, non-lethal self-cutting or pill ingestion), and true suicidal efforts." (*Id.* ¶ 113(b).) Burbach concluded: "In my professional opinion, Ms. Felix is unable to safely and effectively

7

resume her position at the Appleton DMV Service Center. Less clear is whether she would be able to do so at another DMV Service Center subsequent to additional psychiatric treatment." (*Id.* ¶ 113(c).) He also wrote that he "would not recommend that Ms. Felix be permitted by the Wisconsin DOT to continue in her current position[.]" (*Id.* ¶ 113(d)) (emphasis in original).

English emailed Felix on June 6 explaining that the form Dr. Beld submitted was incomplete. She explained why it was incomplete and notified Felix that she must provide complete medical documentation on or before June 17, 2013 or her FMLA leave may be denied. Felix responded June 10 stating that Beld would complete the form and send it. English followed up on June 12 that she had still not received the form. Sarver also emailed Felix on June 13 stating that her FMLA leave request was dependent on whether the DOT received the completed form. English did not receive the documentation on or before June 17.

On June 19, 2013, Sarver emailed Felix a copy of Dr. Burbach's report. Sarver also provided a letter inviting Felix to submit any additional information she thought would be important in assessing her employment status at the DMV. Also on June 19, English received the completed form from Dr. Beld. English could not read all of Beld's handwriting, but one statement she could read provided "current work environment worsens the above, she may tolerate a new work environment better." The form listed a return to work date of July 15, 2013 and indicated Felix should be part-time until August 20, 2013. No restrictions on her work were noted. English also received some medical records of 2012 and March and April 2013 treatment notes on June 20 or 21, 2013. (*Id.* ¶¶ 121–22.)

On June 24, 2013, English received a fax from Felix with a note dated June 21, 2013 from Dr. Beld, which stated: "Please allow my patient to return to work starting July 15, 2013." English

thought this note failed to provide sufficient information as to Felix's ability to safely return to work so she called Dr. Beld's office but was unable to speak with him. English called Beld's office again June 25 and learned Beld lives in Utah and sees patients by video conference. Beld returned English's call later that day. Beld stated that he did know about the April 18 incident and was aware Felix underwent a fitness for duty evaluation, but he declined a copy of report and said he did not speak with Dr. Burbach. English told Beld that Felix was on a "final performance improvement plan" (i.e., the last step of the DOT's process when employees fail performance evaluations) and would not be changing work locations. (*Id.* ¶ 126.) According to Dr. Beld, he informed English during this conversation that Felix was "safe" to return to work and perform her duties. English disagreed with Beld that Felix was not a "risk" and Beld stated that English's attitude and tone was that because Felix was a risk at one point in time, she must then still be a risk, which in his view was not accurate. (PPFOF ¶ 72.) Beld also stated the conversation revealed a shocking level of stigmatization by English against Felix based on Felix's mental illness. (*Id.* ¶ 73.)

English averred that the medical documentation from Felix's health care providers did not change the DOT's position that Felix's employment should be terminated. On June 26, 2013, the DOT notified Felix that her employment at the DMV was terminated because Felix was unfit for duty. (DPFOF ¶ 132.)

## II. LEGAL STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed .R. Civ. P. 56(c); *Celotex Corp.*

9

*v. Catrett*, 477 U.S. 317, 322 (1986). As the defendant has moved for summary judgment, it has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. A defendant may satisfy this initial burden by pointing to the plaintiff's failure to introduce sufficient evidence to support any essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323–24. If this burden is met, the plaintiff must designate specific facts to support his case. *Celotex*, 477 U.S. at 322–24. In analyzing whether a question of fact exists, a court will construe the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

### III. ANALYSIS

**A. Rehabilitation Act Claim**

The Rehabilitation Act protects an "otherwise qualified individual with a disability" from employment discrimination "solely by reason of" a disability. 29 U.S.C. § 794(a). The Act incorporates most of the standards of the Americans with Disability Act (ADA), including that statute's definition of discrimination to include the employer's failure to make a "reasonable accommodation" for the claimant's known physical or mental limitations. *Id.* § 794(d); 42 U.S.C. § 12112(b)(5)(A). Felix claims she was discriminated against based on her Tourette's syndrome, anxiety and depression when she was fired and when the DOT denied her request to transfer to another office, denied her request for extended medical leave, and otherwise failed to provide a reasonable accommodation for her disabilities. (Compl. ¶¶ 13, 85–88.)

**1. Termination**

The DOT moves for summary judgment on Felix's claim arising from the termination of her employment on the ground that it has no obligation under the Rehabilitation Act to retain a

potentially violent employee. In response, Felix argues the DOT's reason for terminating her—that she posed a "direct threat" to workplace safety under 42 U.S.C. § 12111(3) and 29 C.F.R. § 1630.2(r)—is an affirmative defense that the DOT has not asserted until now, and she challenges the admissibility of the evidence upon which the DOT relies to establish she posed such a threat. Felix argues that based on the medical evidence that is properly before the court, a jury could conclude that she was fired because of her disability.

It is true that the Seventh Circuit "has stated that it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation." *Branham v. Snow*, 392 F.3d 896, 906–07 (7th Cir. 2004) (quotations omitted). As the DOT notes in reply, however, its motion is not based on the direct threat defense. According to the DOT: "Although the Rehabilitation Act provides that an employer may terminate a qualified individual if he or she poses a 'direct threat' to health or safety, when an employee actually does something dangerous and disruptive she demonstrates she cannot effectively function at work." (ECF No. 38 at 2) (citation omitted). Relying on *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997), the DOT asserts that Felix was terminated "because her behavior in the workplace was unacceptable." (ECF No. 38 at 2.)

In *Palmer*, an employee was fired after she threatened to kill another employee. 117 F.3d at 352. The court held that even assuming the threat was caused by the employee's mental illness, there was "no evidence [the employee] was fired because of her mental illness[]" and therefore no claim under the ADA. *Id.* The court explained:

> [I]f an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act. The Act does not require an

11

employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.

*Id.* (citations omitted). Furthermore, although ordinarily an employee is not disqualified unless the employer explores "reasonable accommodations" for the employee's disability, the court concluded that a remand to explore the possibilities of accommodations was not required because "[i]t would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent the mentally disturbed employee from getting out of hand." *Id.* at 353.

More recently, the Seventh Circuit applied the same principle to a claim under the Rehabilitation Act in *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013). In *Brunfield*, a police officer was fired for, *inter alia*, feigning injury on the job even though she claimed that her conduct was a product of psychological problems that constituted a disability within the meaning of the Act. The district court concluded that the plaintiff officer failed to state a claim under the Rehabilitation Act, and the Seventh Circuit affirmed, stating: "An employer may fire an employee for engaging in unacceptable workplace behavior without violating the ADA (or the Rehabilitation Act), even if the behavior was precipitated by a mental illness." *Id.* at 630-31. Explaining further, the Court noted: "The Rehabilitation Act protects qualified employees from discrimination 'solely by reason of' disability, meaning that if an employer fires an employee for any reason other than that she is disabled—'even if the reason is the consequence of the disability'—there has been no violation of the Rehabilitation Act." *Id.* at 631.

In this case, Felix did not directly threaten her coworkers and the only actual physical harm she caused was to herself. Nonetheless, it does not follow that because Felix only actually harmed herself, her behavior was acceptable for the workplace. Hysterical screaming and suicidal behavior by an employee in front of co-workers and members of the public is simply not something an employer generally has to tolerate or accommodate. As the DOT contends, "Felix's behavior on April 18, 2013 was unacceptable and objectively demonstrated that Felix was unfit to continue her position." (ECF No. 38 at 3.) Absent a disability, an employer would be entirely justified in terminating an employee who engaged in such behavior immediately. Here, because of the perceived mental health component, the DOT required Felix to undergo a fitness for duty evaluation before she would be allowed to return. Upon reading the resulting report and considering the submissions by Felix's doctors, the DOT decided to terminate her employment.

Felix devotes much of her brief in opposition to DOT's motion arguing that the Psychological Fitness for Duty Evaluation report by Dr. Daniel J. Burbach, the psychologist retained by DOT to conduct the evaluation, is unauthenticated, inadmissible hearsay by an expert whom DOT did not disclose. Felix argues that for these reasons, the report is not admissible and cannot be considered by the court. But Dr. Burbach's report constitutes a key fact of the case, not an expert opinion intended for use at trial. Thus, there was no need to disclose Dr. Burbach as an expert witness. *See* Fed. R. Civ. P. 26(a)(2)(A). Moreover, as the DOT argues in response, Dr. Burbach's report is not offered for the truth of the matter asserted, but to show what decision makers at DOT had before them at the time they made the decision to terminate Felix's employment. *See Haughton v. Orchid Automation*, 206 Fed. App'x. 524, 532 (6th Cir. 2006) ("The Federal Rules of Evidence define hearsay as 'a statement, other than one made by the declarant while testifying at the trial or

13

hearing, offered in evidence to prove the truth of the matter asserted.' Fed.R.Evid. 801. Defendant offered the statements not to prove their truth, however, but to demonstrate the state of mind and motive of Defendant's managers in discharging Plaintiff."). Finally, given the purpose for which it was offered, Dr. Burbach's report was also properly authenticated. Rebecca English, the DOT's medical coordinator, declared from personal knowledge that the report attached to her declaration was in fact the one she received from Dr. Burbach and on which the DOT relied in deciding to terminate Felix. It follows that Dr. Burbach's report is properly before the court.

To prevail on a claim under the Rehabilitation Act, a plaintiff must prove that she was terminated "solely by reason of" a disability. 29 U.S.C. § 794(a). As to this issue, the evidence is undisputed that Felix was fired because, given her behavior, the DOT thought she was unfit for duty and feared for Felix's own safety, as well as the safety and well-being of her co-employees and the public if she returned. Before the workplace incident, the DOT tolerated, and in fact accommodated, Felix's alleged disabilities for some time. When she would have a panic attack, she was permitted to take a break from work, take her medication and do breathing exercises, and return to work when her anxiety subsided. But after the episode on April 18, 2013, the DOT relieved her from duty immediately. Part of Felix's job, after all, required her riding along alone with brand new drivers while administering road tests. The DOT required her to submit to a fitness for duty examination by an independent doctor. That doctor concluded she "remains at risk for potentially violent behavior toward self <u>and</u> others within the workplace." Felix was provided a reasonable opportunity to submit her own medical evidence to persuade the DOT she would not experience a similar episode in the future, but she failed to provide any such reassurance. The fact that Dr. Beld believed she no longer posed any threat does not mean there needs to be a trial in this court. Dr. Beld

14

provided minimal information to the DOT, which was based solely on video conferences with Felix. The DOT was thus entitled to reject Beld's opinion based on Felix's actual workplace conduct and all of the other medical records, including the fitness for duty evaluation.

Plaintiff does not argue the DOT's stated reason for terminating her was a pretext, and it would appear that such an argument would lack evidentiary support in any event. Instead, she appears to argue that the DOT was simply wrong about her fitness for duty and contends that she is entitled to a trial to prove that its decision was in error. But in the context of a suit for employment discrimination, the issue isn't whether the employer's proffered reason was wrong. In the discrimination context pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir.2002). Federal courts "do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." *Magnus v. St. Mark United Methodist Church,* 688 F.3d 331, 338 (7th Cir. 2012) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001)). Felix has offered no evidence suggesting that the DOT was not truly convinced that she was unfit for duty as a result of her outburst on April 18, 2013, and instead fired her because of a disability. The DOT is therefore entitled to summary judgment on Felix's Rehabilitation Act claim arising from the termination of her employment.

**2. Failure to Accommodate**

Felix's complaint also states the DOT violated the Rehabilitation Act by denying her request to transfer to another office, denying her request for extended medical leave, and otherwise failing to provide a reasonable accommodation for her disabilities. (Compl. ¶¶ 85, 87, 88.) The only accommodation Felix argues she should have been provided, however, is a transfer to the Eau Claire

15

DMV. (Pl.'s Mem. at 26–29, ECF No. 28.) Felix had, as explained above, expressed an interest in such a transfer on several occasions.

The Rehabilitation Act requires an employer "transfer a disabled employee to vacant positions for which she is qualified where necessary to accommodate her disability." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 208 (3rd Cir. 2009). But it is the employee who must begin the accommodation process by notifying her employer of a disability. *Spurling v. C&M Fine Pack Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). Then, the employer must "engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Id.* The employer will only be liable "if it bears the responsibility for the breakdown in the interactive process." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

Here, Felix requested a transfer in June of 2012. She was told that there were no vacancies in Eau Claire and that she was not eligible for a transfer while she had an unsatisfactory performance evaluation. Felix also requested a "medical transfer" in November of 2012, and the DOT advised her to talk to Rudd and English. Rudd advised Felix to submit medical documentation of her disability and explain how the disability prevented Felix from performing the functions of her job. Felix did not do so. It was her own actions, then, that caused a breakdown in the interactive process.

Perhaps recognizing her only participation in this process was her repeated transfer requests, Felix argues a fact dispute exists as to whether a transfer was a reasonable accommodation. The DOT argues an employee is not entitled to be transferred due to an interpersonal conflict and that there is no reason to believe that Felix's job performance issues would be any better in Eau Claire. Felix responds that "[i]f financial accuracy concerns did not prevent Defendant from returning Ms. Felix to her position at its Appleton, Wisconsin location, it cannot be a sufficient legal argument to

16

refuse to reasonably accommodate her disabilities by transferring her to its Eau Claire, Wisconsin location." (ECF No. 28 at 29.)

Felix's argument is flawed because her financial accuracy issues *were* an ongoing issue in Appleton. She was nearing the end of the DOT's procedure for probationary employees who fail performance evaluations. This appears to have been a major factor contributing to her earlier panic attack, and perhaps the April 18 incident as well, given her concern the day before and morning of the incident that she could lose her job. The Rehabilitation Act does not require an employer to provide whatever accommodation the employee requests or prefers. *Gratzl v. Office of the Chief Judges*, 601 F.3d 674, 681–82 (7th Cir. 2010). Felix's failure to accommodate claim must therefore fail as well.

## B. FMLA Claim

Felix also asserts an interference claim under the Family Medical Leave Act.[2] The FMLA grants employees up to 12 weeks of unpaid leave every year to care for themselves or family members who are ill, and to attend to certain family needs such as pregnancy, childbirth, and adoption. 29 U.S.C. § 2612(a)(1). The statute's provision for an employee's leave to attend to his or her own serious medical illness is referred to as the "self care provision," whereas leave to attend to a family member falls under the "family care provision." *See Coleman v. Court of Appeals of Maryland*, --- U.S. --- , 132 S. Ct. 1327, 1332–33 (2012).

The DOT moved for summary judgment on the ground that it is entitled to sovereign immunity from Felix's FMLA claim. Congress created a private right of action for damages and

---

[2]Felix also asserted an FMLA retaliation claim in the complaint, but she has stipulated to dismissal of that claim. (ECF No. 27.)

17

equitable relief under the FLMA. 29 U.S.C. § 2617(a)(2). In *Coleman*, however, a majority of the Supreme Court held that Congress did not validly abrogate the states' sovereign immunity as to the self care provision. 132 S. Ct. at 1338 (plurality opinion); *see also id.* at 1338 (Scalia, J., concurring in the judgment). It is undisputed that the state of Wisconsin has not waived its sovereign immunity or that the DOT is entitled to invoke the state's sovereign immunity. *See Toeller v. Wisc. Dept. of Corr.*, 461 F.3d 871, 879–80 (7th Cir. 2006).

In response, Felix notes that the *Coleman* decision did not diminish an employee's right to recover non-monetary relief from a state-employer's violation of the FMLA's self care provision. Felix argues, relying on what appears to be the only post-*Coleman* court of appeals decision addressing the issue, that an employee may seek reinstatement of employment under the FMLA and the doctrine of *Ex parte Young*, which generally holds that state actors can be sued in their official capacity notwithstanding sovereign immunity when the claimant seeks prospective relief to end a continuing violation of federal law. *See Diaz v. Michigan Dept. of Corrections*, 703 F.3d 956, 964 (6th Cir. 2013) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Thus, Felix argues the DOT is not entitled to sovereign immunity from her claim for reinstatement under the FMLA.

In reply, the DOT points out that a claim under *Ex parte Young* is only authorized against an individual state actor in his or her official capacity. In this case, the DOT is the sole defendant. Indeed, the individual nature of the defendant is an important element of the *Ex parte Young* doctrine because "the view that sovereign immunity does not apply [is based on the notion that] an official who acts [contrary to federal law] is 'stripped of his official or representative character,'" and thus stripped of the sovereign immunity of the state. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. at 160). Such an individual is therefore

18

"subjected in his person to the consequences of his individual conduct [and] [t]he state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Ex part Young*, 209 U.S. at 160. Because Felix only sued the DOT, summary judgment is proper.

Even if Felix had sued an individual state actor acting in his or her official capacity, though, I would conclude that her interference claim would fail. The statute under which she claims she is entitled to reinstatement provides that "nothing in [it] shall be construed to entitle any restored employee to[] . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). In other words, the right to reinstatement under the FMLA is not absolute. *Goelzer v. Sheboygan County*, 604 F.3d 987, 993 (7th Cir. 2010). When an employee on FMLA leave is discharged for poor performance or because of disruptive conduct in the workplace, regardless of whether he or she exercised FMLA rights, the employee is not entitled to reinstatement. *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 981 (8th Cir. 2005).

Here, Felix left work immediately following the April 18 incident. The DOT then initiated the FMLA process, providing Felix with information about how to submit an FMLA request. As explained above, the DOT proceeded to investigate and ultimately conclude Felix was unfit for duty, and it terminated her on that basis. Regardless of whether Felix exercised her FMLA rights, then, she is not entitled to reinstatement because she was discharged for a lawful reason that had nothing do with her request for leave. It follows that there is no continuing violation of federal law that would bring Felix's claim within the scope of the exception outlined in *Ex parte Young*. Summary judgment will therefore be entered in favor of the DOT on the FMLA claim as well.

## IV. CONCLUSION

For all of these reasons, the DOT's motion for summary judgment is granted and all claims against the DOT are hereby dismissed. The motion to seal Plaintiff's medical records is granted. The Clerk is directed to enter judgment accordingly.

Dated this  17th  day of April, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
